# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00300-CR

---

**The State of Texas, Appellant**

**v.**

**Megan Leigh Vaughn, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 6 OF TRAVIS COUNTY**
**NO. C-1-CR-18-200168, THE HONORABLE BRANDY MUELLER, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

The State of Texas appeals the trial court's orders granting pretrial motions to suppress filed by appellee Megan Leigh Vaughn, who was charged by information with misdemeanor driving while intoxicated (DWI). *See* Tex. Code Crim. Proc. art. 44.01(a)(5); Tex. Penal Code § 49.04(a). Vaughn filed four motions in the trial court, requesting, respectively, suppression of: (1) oral statements; (2) blood-test results; (3) video evidence; and (4) all tangible evidence, all written and oral statements, testimony concerning her actions while under detention or arrest, and testimony concerning tangible evidence or statements. Following a pretrial evidentiary hearing, the trial court granted her second and fourth motions. Upon the State's request, the trial court issued findings of fact and conclusions of law. In a single issue, the State contends that the trial court abused its discretion by granting Vaughn's motions to suppress and finding that the parking garage where the charged offense occurred was not a "public place."

We will reverse the trial court's orders granting the motions to suppress and remand for further proceedings.

## BACKGROUND[1]

In the early morning on January 5, 2018, Austin Police Department (APD) officers were conducting a DWI investigation in the residential parking garage of The Bowie apartment complex[2] when Vaughn parked in an open space "in the midst of [their] scene." Corporal Cameron Staff noticed that Vaughn's balance was "visibly impaired." Staff asked a second officer, Brian Huckaby, to "make contact" with Vaughn and "stop her." After speaking with Vaughn, Huckaby determined that she was possibly intoxicated and detained her until officers with the DWI Unit arrived. Following an investigation, Vaughn was arrested for DWI.

Officers first arrived at the garage after following a vehicle that had been involved in a collision as part of the unrelated investigation. The vehicle entered the garage, but the security gate closed before officers could follow. Huckaby, who was on a bicycle, spoke with a Bowie employee in front of the complex. The employee allowed officers into the garage to search for the vehicle. Huckaby testified at the suppression hearing that while he did not know if the garage was open to the public, he did not know "how a regular person can access it." He also

---

[1] The facts recited are taken from the testimony and evidence presented at the pretrial suppression hearing.

[2] During the suppression hearing, the State referred to the complex as an "apartment," and defense counsel a "downtown condo complex." The trial court, in its findings of fact, referred to the complex as both a "condo complex" and "condominium/apartment building." With respect to the issue before us, it is irrelevant whether The Bowie is a condominium or apartment complex. *See Thibaut v. State*, 782 S.W.2d 307, 308–09 (Tex. App.—Eastland 1989, no pet.) ("[D]ue to the obvious similarities and apparent lack of distinctions between the common areas of multi-unit apartment houses and those of multi-unit condominiums, the legislature must have contemplated that the inclusion of one type of multi-unit complex should include the other.").

testified that he did not know if there was paid parking in the garage or whether guests were allowed to visit the complex. He did not notice guest parking in the garage. While attempting to gather video footage from the garage's cameras as part of the initial investigation, Huckaby learned that a key fob was necessary to use the complex's elevators, which are connected to the reserved parking garage.

Officer Robert Mitchell, a member of APD's DWI Unit, arrived after the other officers and spoke with building security because he "didn't have access to get into the parking garage." The security guard mentioned a visitor's parking lot, and there were signs for both "Bowie Visitor" parking and "Reserved Parking." At the suppression hearing, Mitchell testified that he did not know whether the gated vehicle entrance was the only way to access the reserved parking garage. He testified that it did not appear that there was any place to pay to park in the garage; that he could not recall whether it contained a visitor's area; that he did not notice "Reserved" signs in front of the parking spots; and that once an individual had access to the garage through the security gate, he or she could access any of its floors.

Videos from Huckaby's body-camera and Mitchell's vehicle dash-camera were admitted into evidence at the suppression hearing. The garage contained at least six floors, and dozens of vehicles were visible on the footage. A sign reading "Reserved Parking" could be seen in large silver letters above the entrance to the garage, and a towing sign was prominently displayed between the entry and exit gates. Additional towing signs and a digital "Resident Parking" sign were visible elsewhere in the garage. "Reserved" placards were present in front of every visible open spot.

**DISCUSSION**

In a single issue, the State contends that the trial court abused its discretion by finding that the reserved parking garage did not constitute a "public place" for purposes of subsection 49.04(a) of the Texas Penal Code.[3] *See* Tex. Penal Code § 49.04(a); *see also id.* § 1.07(a)(40).

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). We view the record in the light most favorable to the trial court's determination, and "the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *Id.* (quoting *Dixon*, 206 S.W.3d at 590); *see State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

In general, we apply a bifurcated standard of review. *State v. Le,* 463 S.W.3d 872, 876 (Tex. Crim. App. 2015) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (citing *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)). We give "almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Amador*, 221 S.W.3d at 673 (quoting *Guzman*, 955 S.W.2d at 89). We also apply this "deferential standard of review" to "a trial court's determination of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing." *Id.* (quoting *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006)). Moreover, we "afford the same level of

---

[3]   Both sides agree that whether the garage was a public place under subsection 1.07(a)(40) of the Texas Penal Code is dispositive of the trial court's ruling. Argument during the suppression hearing was limited to this issue.

deference to a trial court's ruling on 'application of law to fact questions,' or 'mixed questions of law and fact,' if the resolution of those questions turns on an evaluation of credibility and demeanor." *Id.* (quoting *Montanez*, 195 S.W.3d at 107). We "review de novo 'mixed questions of law and fact' that do not depend upon credibility and demeanor." *Id.* "Because the issue presented in this case is whether the court properly applied the law defining 'public place' to the facts, we review the issue *de novo*." *State v. Gerstenkorn*, 239 S.W.3d 357, 358 (Tex. App.—San Antonio 2007, no pet.).

Under subsection 49.04(a) of the Texas Penal Code, an individual commits an offense if he or she "is intoxicated while operating a motor vehicle in a public place." Tex. Penal Code § 49.04(a). "'Public place' means any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops." *Id.* § 1.07(a)(40). The definition is "cast in broad language," is "open-ended," and "leaves discretion to the courts to expand its parameters where appropriate." *Gerstenkorn*, 239 S.W.3d at 358–59; *see Woodruff v. State*, 899 S.W.2d 443, 445 (Tex. App.—Austin 1995, pet. ref'd).

"The relevant inquiry is whether the public has access to the place." *Gerstenkorn*, 239 S.W.3d at 359; *see State v. Nailor*, 949 S.W.2d 357, 359 (Tex. App.—San Antonio 1997, no pet.) ("The relevant inquiry is whether the public can enter the premises."); *see also Loera v. State*, 14 S.W.3d 464, 467–68 (Tex. App.—Dallas 2000, no pet.) ("The key to determining the sufficiency of the evidence in this case turns on the meaning and application of the term 'access,' not on the common understanding of the term 'public.'"). The fact that an individual is not "supposed" to be present in a place is "irrelevant to the determination of whether the place is one to which the public has access." *Perry v. State*, 991 S.W.2d 50, 52 (Tex. App.—Fort Worth

5

1998, pet. ref'd) (concluding that park in which defendant was present after hours of operation was public place). Likewise, restrictive measures to limit access are inconsequential; in determining whether a place is public, "the proper focus should be on the extent of actual access and not on the formalities by which access is gained." *Woodruff*, 899 S.W.2d at 445. We have previously recognized that "[a]uthority exists for the proposition that 'if the public has *any* access to the place in question, it is public.'" *Id.* (quoting Michael B. Charlton, 6 Tex. Prac., Texas Criminal Law, 445–46 § 1.6 (2d ed. 1994)). Although "access" is not defined in the Penal Code, it is "commonly defined" as "freedom of approach or communication; or the means, power, or opportunity of approaching, communicating, or passing to and from." *Loera*, 14 S.W.3d at 467 (quoting *Access*, Black's Law Dictionary (6th ed. 1990)). When construing the meaning of a statute, we look to its literal text, *Martin v. State*, 635 S.W.3d 672, 677 (Tex. Crim. App. 2021), and give effect to the text's plain meaning, *State v. Velasquez*, 539 S.W.3d 289, 292 (Tex. Crim. App. 2018); *see* Tex. Penal Code § 1.05(a) (providing that statutes in Penal Code should not be "strictly construed" and that Code's provisions "shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code").

With respect to the issue in question, the trial court made the following findings of fact:

1. At the time of the offense, Defendant resided at The Bowie located on 311 Bowie Street, Austin, Texas. The Bowie is a condo complex in downtown Austin.

2. The Bowie is a multi-unit apartment/condominium complex with security features that limit public access to all areas of the complex including the residential parking garage.

3. The residential parking garage is incorporated into the building and access to the garage is cutoff to the public by way of a solid opaque door.

6

4.    The door blocks vehicle and pedestrian access and requires an individualized code to access.

5.    The Bowie has a "Visitor" parking area which is separate from the private residential parking garage on the other side of the building. There is no public or pay parking in this facility.

6.    On January 5, 2018, officers from the Austin Police Department were investigating an unrelated call. In this unrelated case, the suspect had allegedly left the scene of a collision and entered the private residential parking garage.

7.    The Officers called to investigate[] had to exit their vehicles and walk into the inside lobby of the condominium/apartment building to speak with someone with the building's security in order to obtain entry. Security personnel for the building opened the garage door for the Officers to enter the parking garage. Law enforcement would not have been able to enter the garage without this assistance.

. . . .

15.   The [O]fficers testified that they could not access the parking garage or the building without assistance from The Bowie staff, nor could they enter the lobby without staff assistance. The Officers were forced to exit their vehicles and walk up to the building and speak with security, in order for the garage door to be opened to gain entry.

16.   Likewise, Officers testified that they needed assistance from complex staff to access the elevator inside of the parking garage. The elevator in the parking garage also required a code or fob to utilize.

17.   Officer Mitchell testified that he responded to the call and could not access the garage without assistance from staff. Officer Mitchell testified that upon reviewing his video driving up the garage, that the parking spots appeared to be marked reserved.

. . . .

19.   No evidence was presented that the Defendant drove her vehicle anywhere other than inside the parking garage of The Bowie.

20.   No evidence was presented that anyone could gain access to the private residential parking garage under any circumstances other than the circumstances presented in this case, i.e.[,] where the individuals had authorized electronic key access to the building and where officers

7

requested access to the building in their official capacity as peace officers investigating the occurrence of an unrelated crime.

Although Vaughn correctly asserts that the residential garage's features limit public access, our review is centered not on such "formalities" but on "the extent of actual access." *See Woodruff*, 899 S.W.2d at 445. The legislature, by the express wording of subsection 1.07(a)(40), has determined that the common areas of apartment houses are public places to which the public or a substantial group of the public has access. *See* Tex. Penal Code § 1.07(a)(40). The statute's text and its plain meaning are therefore determinative in this case. *See Martin*, 635 S.W.3d at 677; *Velasquez*, 539 S.W.3d at 292. We do not find that such a plain-language interpretation is ambiguous or would lead to absurd results that the legislature could not have intended. *See State v. Schunior*, 506 S.W.3d 29, 34 (Tex. Crim. App. 2016). Consequently, we need not look beyond the statute's text. *Id.*

Our interpretation of subsection 1.07(a)(40) is supported by case law. We have previously held, in two unpublished cases, that the parking lots of apartment complexes are public places. *See State v. McAlpin*, No. 03-06-00120-CR, 2007 WL 700839, at *2 (Tex. App.—Austin Mar. 7, 2007, no pet.) (mem. op., not designated for publication); *In re W.T.O.*, No. 03-01-00630-CV, 2002 WL 31599094, at *3 (Tex. App.—Austin Nov. 21, 2002, no pet.) (not designated for publication). In addition, our sister courts "have consistently held that parking lots are public places." *Texas Dep't of Pub. Safety v. Briggs*, No. 03-05-00331-CV, 2006 WL 305306, at *4 (Tex. App.—Austin Feb. 9, 2006, no pet.) (mem. op., not designated for publication); *see, e.g., Thibaut v. State*, 782 S.W.2d 307, 309 (Tex. App.—Eastland 1989, no pet.) (parking lot of multi-unit condominium complex was public place); *Evans v. State*, 995 S.W.2d 284, 286 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ("We first begin with

the general premise that the common areas of an apartment complex that include the parking lots and sidewalks are public areas[.]"); *Nailor*, 949 S.W.2d at 359 (hotel parking garage was public place even though people must pay to enter); *Holloman v. State*, No. 11-95-275-CR, 1995 WL 17212433, at *1 (Tex. App.—Eastland Dec. 21, 1995, pet. ref'd) (not designated for publication) (per curiam) (parking lot of apartment complex that had 200-300 residents, was surrounded by metal fence, and required electronic "gate card" to enter was public place); *Kapuscinski v. State*, 878 S.W.2d 248, 250 (Tex. App.—San Antonio 1994, pet. ref'd) (mall parking lot was public place); *Leffall v. State*, 680 S.W.2d 683, 685 (Tex. App.—Fort Worth 1984, pet. ref'd) (parking lot for apartment complex was public place); *Robinson v. State*, No. 08-12-00146-CR, 2014 WL 2090530, at *3 (Tex. App.—El Paso May 16, 2014, pet. ref'd) (not designated for publication) (noting that officer observed defendant "exiting a vehicle in the parking lot of an apartment complex, a public place"); *Kindle v. State*, No. 05-01-01818-CR, 2003 WL 22707234, at *3 (Tex. App.—Dallas Nov. 18, 2003, no pet.) (rejecting argument that hotel garage was not public place even though it was privately owned, and security was used to keep general public out).

The Eleventh Court of Appeals' decision in *Thibaut* is particularly instructive. The defendant in that case was arrested for DWI after colliding with a parked car in the parking lot of a 128-unit condominium complex. *Thibaut*, 782 S.W.2d at 309. The trial court found that there was sufficient evidence to find that the parking lot constituted a "public place" under section 1.07.[4] *Id.* As the appellate court explained:

---

[4] Although the trial court considered a prior version of section 1.07, the definition of "public place" is identical in the current version of the statute. *Compare* Tex. Penal Code § 1.07(a)(29) *with* Tex. Penal Code § 1.07(a)(40).

> Appellant was arrested in the parking lot of a 128–unit condominium complex which was accessible to the public. Appellant owned and lived in one of the units in the complex. Section 1.07(a)(29) defines "public place" as any place where a substantial group of the public has access including, but not limited to, the common areas of apartment houses.
>
> Clearly, the non-exclusive language of this statute indicates that it is broad enough to encompass the parking lot of a multi-unit condominium complex. A substantial group of the public had access to the parking lot of the 128–unit condominium complex . . . . Hence, we construe public place to include the parking lot of a multi-unit condominium complex which is accessible to a substantial group of the public.

*Id.* at 308–09.

Vaughn attempts to distinguish *Thibaut* by emphasizing that the defendant was arrested in a parking lot, not a garage, and that the court expressly acknowledged that the lot was accessible to a substantial group of the public. Even if there may be some circumstances in which an apartment parking garage is not a public place, under the circumstances of this case—regardless of whether we term it a "garage" or "lot"—the Bowie's parking structure is a "common area" of an apartment house and therefore falls under the definition of "public place" "to which the public or a substantial group of the public has access".[5] Tex. Penal Code § 1.07(a)(40); *see Nailor*, 949 S.W.2d at 358–59 (using terms "lot" and "garage" interchangeably and concluding that Holiday Inn garage was public place).

---

[5] The record also includes evidence that the public or a substantial group of the public had access to the garage. Vaughn was detained on the garage's sixth floor, and footage introduced during the suppression hearing shows dozens of vehicles parked in the garage. Each resident of The Bowie is a member of the public. *See Substantial*, Black's Law Dictionary (11th ed. 2019) (defining "substantial" as "[c]onsiderable in extent, amount, or value; large in volume or number"). Moreover, as Officer Mitchell testified, it is often possible to follow vehicles into such garages. Alternatively, a resident could lend his or her key fob to a guest who could then park in the residential garage. Vaughn told officers that she did not have a designated spot, nor were there visible stickers or permits on the vehicles parked in the garage. Consequently, an individual in possession of a key fob would seemingly have unrestricted access. Finally, nothing suggests that guests could not simply accompany residents into the residential garage.

Accordingly, based on the circumstances of this case, we conclude that The Bowie's parking garage was a public place under subsection 1.07(a)(40) of the Texas Penal Code. We sustain the State's issue on appeal.

**CONCLUSION**

Having sustained the State's sole issue on appeal, we reverse the trial court's orders granting Vaughn's motions to suppress and remand for further proceedings.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Smith

Reversed and Remanded

Filed:   April 5, 2022

Do Not Publish

11